67 F.3d 299
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Carr JOHNSON, Plaintiff-Appellant,
v.
Dennis BAKER, et al., Defendants-Appellees.
 No. 94-3828.
 United States Court of Appeals, Sixth Circuit.
 Sept. 27, 1995.
 
 Before: JONES, GUY, and BOGGS, Circuit Judges.
 GUY, Circuit Judge.
 
 
 1
 Plaintiff, Carr Johnson, is an Ohio State Prison inmate currently incarcerated at Mansfield Correctional Institution (MANCI). Johnson is a Nation of Islam Muslim. Although MANCI offers religious services for followers of Islam, Johnson claims his faith differs sufficiently from that of orthodox Islam that he must be afforded a separate religious service.[1] When his request for such separate services was denied, this litigation ensued.
 
 
 2
 By agreement, the case was submitted to the district court on a set of stipulated facts. The trial judge denied the relief requested by the plaintiff in an opinion that carefully considered plaintiff's contentions and legal argument. Our review of the record convinces us that Judge Dowd reached the correct result and we affirm on the basis of his written opinion. We write briefly only for additional clarification.
 
 I.
 
 3
 The background of this litigation best can be summarized by quoting directly from the factual stipulation filed by the parties:
 
 
 4
 In early 1993, Plaintiff Johnson attended Jummah Service at ManCI. Plaintiff Johnson requested a time for Nation of Islam Muslims to meet. The Imam denied the request. Plaintiff Johnson wrote to Defendant, Warden Baker, with the same request. Defendant, Deputy Warden, Father David Foxen met with Plaintiff Johnson and told him that he and Defendant, Warden Baker, decided to deny the request. Plaintiff Johnson wrote Defendant Baker requesting reconsideration of his decision not to provide Nation of Islam Muslims a separate time and place to meet. Plaintiff Johnson received no further response from Defendants Baker or Foxen.
 
 
 5
 In September 1993, following initiation of this suit and discussion with counsel for the defendants on the applicable proceedings for requesting separate services, Plaintiff Johnson submitted an application ... for the establishment of a Nation of Islam worship service to Defendant, Rev. Marloe H. Karlen. On October 15, 1993, Defendant Karlen denied the request....
 
 
 6
 RELIGIOUS GROUPS PRESENTLY ACCOMMODATED AT MANCI
 
 
 7
 Currently, at ManCI, several religious groups are provided a time and place for meeting. These include Islamic, Jehovah Witness, Jewish, Protestant Christian, and Roman Catholic groups. These groups are accommodated separately because each has its own unique holy book and represents a different religion, not just a sect within a religion, resulting in significant differences in teachings and beliefs. For example, the Roman Catholic Bible contains 16 books not included in the Protestant Bible. The Jewish religions use only the Torah and the Prophets. Islam uses the Qur'an (Koran). The Jehovah Witness group has its own unique translation of the Bible. The Jehovah Witness group does not meet for a separate worship service, but does have a separate study class in which the members use their Bible and study their teachings.
 
 
 8
 In addition to participating in the services held by the aforementioned groups, inmates are free to supplement these accommodations with individual pursuits. As Rev. Karlen indicated in his denial of Plaintiff Johnson's request, Plaintiff Johnson has
 
 
 9
 the right to augment these services by individual study by communicating with the Imam of your choice to seek specific instruction and counsel in your belief system, as well as have this Imam, recorded on your visit list as your minister-of-record. These alternatives will give you the chance to receive individual instructions in specific beliefs and teachings of the Nation of Islam by an Imam of the Muslim group.
 
 
 10
 Thus, according to the system in place at ManCI, Plaintiff Johnson could attend Islamic services for those aspects with which he concurs, e.g., the teachings of the Qur'an (Koran) and augment this accommodation for those aspects not shared.
 
 
 11
 (App. 50-52.)
 
 
 12
 Johnson's reasons for feeling that what the prison offers does not meet his religious needs are also summarized in the parties' stipulation:
 
 
 13
 Plaintiff Johnson asserts that as a true believer in the Nation of Islam religion, he believes in some of the basic tenets of the Islamic religion, such as no harm or aggression; no profanity; no drug use; no smoking; and no stealing. However, as a follower of the Nation of Islam, Plaintiff Johnson believes that Allah appeared in the United States in the person of Fard Muhammad on July 4, 1930 in Detroit, Michigan; that Allah is man, and is comprised of all men and women; and that prayers should be made while standing upright, with his feet at a 45 degree angle, cupping his hands to his face, not prostrate or kneeling as other Muslims pray. Plaintiff Johnson has adhered to these beliefs since he entered the Ohio penal system.
 
 
 14
 (App. 53.)
 
 II.
 
 15
 In 1993, Congress passed the Religious Freedom Restoration Act (RFRA or Act). 42 U.S.C. Sec. 2000bb et seq. This Act provides in pertinent part:
 
 
 16
 (a) In general
 
 
 17
 Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b) of this section.
 
 
 18
 (b) Exception
 
 
 19
 Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person--
 
 
 20
 (1) is in furtherance of a compelling governmental interest; and
 
 
 21
 (2) is the least restrictive means of furthering that compelling governmental interest.
 
 
 22
 42 U.S.C. Sec. 2000bb-1.
 
 
 23
 The passage of this Act makes it unnecessary to a large degree to parse prior judicial pronouncements since the Act specifically provides:
 
 
 24
 (b) Purposes
 
 
 25
 The purposes of this chapter are--
 
 
 26
 (1) to restore the compelling interest test as set forth in Sherbert v. Verner, 374 U.S. 398 (1963) and Wisconsin v. Yoder, 406 U.S. 205 (1972) and to guarantee its application in all cases where free exercise of religion is substantially burdened....
 
 
 27
 Id. at Sec. 2000bb(b).
 
 
 28
 In restoring the compelling interest test, Congress indicated its intention to overrule legislatively the Supreme Court's earlier decision in Employment Division v. Smith, 494 U.S. 872 (1990). See 42 U.S.C. Sec. 2000bb.
 
 
 29
 In Sherbert v. Verner, 374 U.S. 398 (1963), the Court struck down the disqualification of a Seventh-Day Adventist from receiving unemployment compensation benefits. The plaintiff in Verner had been discharged following her refusal to work on Saturday, the Sabbath of her faith.
 
 
 30
 In Wisconsin v. Yoder, 406 U.S. 205 (1972), the Court determined that Wisconsin's compulsory school-attendance law violated the Free Exercise Clause of the First Amendment by requiring members of the Amish faith to send the children to public or private schools rather than educate them at home.
 
 
 31
 In Smith, which was the decision that precipitated congressional action, the Court held that the Free Exercise Clause permits the state to prohibit sacramental peyote use and to deny unemployment benefits to persons discharged for such use. In reaching this result, the Court, under the facts presented, specifically rejected application of the "compelling interest" test applied in Verner and its progeny.
 
 
 32
 None of the trilogy of cases alluded to in RFRA involved prison inmates, however, Congress made it clear in the legislative history to the Act that it was not unmindful of the potential impact of RFRA in the prison setting:
 
 
 33
 The Religious Freedom Restoration Act would establish one standard for testing claims of Government infringement on religious practices. This single test, however, should be interpreted with regard to the relevant circumstances in each case.
 
 
 34
 A long series of Supreme Court decisions has examined the unusual status of prisoners for first amendment purposes. The Court has recognized that prisoners possess first amendment rights, including the right to freely exercise their religions.
 
 
 35
 ... [t]he intent of the act is to restore the traditional protection afforded to prisoners to observe their religions which was weakened by the decision in O'Lone v. Estate of Shabazz. Prior to O'Lone, courts used a balancing test in cases where an inmate's free exercise rights were burdened by an institutional regulation; only regulations based upon penological concerns of the "highest order" could outweigh an inmate's claims. As articulated by the U.S. Court of Appeals for the Sixth Circuit:
 
 
 36
 While recognizing that the courts may not substitute their judgments for those of prison administrators in matters of prison procedure and management, it nonetheless remains true that the "asserted justification of such restrictions on religious practices based on the State's interest in maintaining order and discipline must be shown to outweigh the inmate's First Amendment rights," and "only those interests of the highest order and those not otherwise served can overbalance legitimate claims to the free exercise of religion." We are of the opinion that the state must do more than simply offer conclusory statements that a limitation of religious freedom is required for security, health or safety in order to establish that its interests are of the "highest order." [see Weaver v. Jago, 675 F.2d 116, 119 (6th Cir.1982) (citations omitted) ]
 
 
 37
 O'Lone weakened this standard, holding that prison rules that burden prisoners' religious practices satisfy the free exercise clause if they are "reasonably related to legitimate penological interests." The intent of the act is to restore traditional protection afforded to prisoners' claims prior to O'Lone, not to impose a more rigorous standard than the one that was applied.
 
 
 38
 S.Rep. No. 111, 103rd Cong. 1st Sess. 9 (1993), reprinted in 1993 U.S.C.C.A.N. 1892, 1898-99 (footnotes omitted).
 
 
 39
 In O'Lone v. Estate of Shabazz, 482 U.S. 342 (1987), referenced in the legislative history, the Court was called upon to review a prison policy that resulted in certain Islamic inmates being unable to attend Jumu'ah, the weekly religious observance commanded by the Koran. The Court upheld the prison regulations and rejected the holding of the Third Circuit, which required prison officials to prove that no reasonable methods existed by which the prisoner's religious rights could be accommodated without creating serious security problems. The Court instead applied the rationale set forth in Turner v. Safley, 482 U.S. 78 (1987). Significant factors to be examined included the relation of the regulation to legitimate government interests, the alternative means available to inmates to exercise the right in question, and finally, the impact the accommodation of the inmates' asserted right on other inmates or the prison generally.
 
 
 40
 Although the legislative history to RFRA references O'Lone, the statute itself makes no such reference. Accordingly, there may be some legitimate debate as to the precise effect RFRA has on the O'Lone decision. We need not enter that thicket here, however, because it is clear that the statute only prohibits the "substantial burden" of a person's exercise of religion. Like the district judge, we conclude that no substantial burden was placed on Johnson's free exercise of his religious beliefs.
 
 
 41
 We first note that this case differs from those involving the prohibition of some specific practice of a person's religion, such as the smoking of peyote[2] or the sacrifice of live animals.[3] Johnson has no proscriptions placed on his beliefs or the practices of his religion, but is simply deprived of a special time and place to observe his beliefs exclusively with others who profess the same faith. We emphasize "exclusively" because all of those who claim to be Nation of Islam Muslims may attend together the regular Islamic service. In Bryant v. Gomez, 46 F.3d 948 (9th Cir.1995), the court analyzed an inmate's complaint similar to the one made here. Bryant, a prison inmate, had sought and been denied a separate full Pentecostal service. The court concluded that the refusal did not violate RFRA because Bryant's free exercise of religion was not "substantially burdened." The holding in Bryant was bottomed on the fact that the plaintiff was not precluded from "participating in the practices and using the 'traditional instruments' which are specific to his faith and distinct from other Protestant faiths." Id. at 949.
 
 
 42
 The record reflects two categorical differences between the Nation of Islam Muslim and the other Islamic practitioners. In the first category are those differences that do not affect the religious service itself but relate to personal beliefs. For example, Nation of Islam Muslims do not believe in reincarnation. There is no showing, however, that Johnson cannot meaningfully participate in an Islamic religious service[4] simply because he may be in the presence of others who do believe in reincarnation.
 
 
 43
 The second category involves specific practices involved with the service itself. The principal, if not only, difference referenced in the record involves the body position during prayers. Nation of Islam Muslims pray standing upright with their feet at a 45-degree angle as opposed to being in a kneeling or prostrate position. Here again, if there is any real strength of belief, it would not seem to destroy the value or meaning of the service if people assume somewhat different postures during prayers.[5] Not to put too fine a point on it, but the whole issue of the prayer position demonstrates the difficult situation in which prison officials are placed. Would a separate service be mandated for one who believed the feet should be at a 60-degree angle? One would have to be naive to overlook the fact that inmates sometimes adopt religious postures to gain other ends. If an orthodox established religion does not satisfy those ends, then one may be invented or modified. Religion du jour is alive and well in the prison system. We recognize that no challenge was made in the district court to the sincerity of Johnson's belief and none is intended here. The Supreme Court, however, has recognized that in the prison context, actions taken for one inmate may legitimately be viewed in the context of its ripple effect on the entire prison population. What is done for one will have to be done for others.[6]
 
 
 44
 We conclude by noting that since we have found no substantial burden is being placed on Johnson's exercise of his religious beliefs[7] there is no need to explore the issue of whether a compelling government interest is being furthered in the least restrictive manner.
 
 
 45
 AFFIRMED.
 
 
 46
 NATHANIEL R. JONES, Circuit Judge, concurring.
 
 
 47
 I concur with the court's judgment that Johnson's free exercise has not been substantially burdened. I do not, however, join in the majority's discussion comparing Nation of Islam with Orthodox Islam or the majority's comments on "religion du jour."
 
 
 48
 Section (a) of the Religious Freedom Restoration Act states: "Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b) of this section." 42 U.S.C. Sec. 2000bb-1(a). To determine whether a person's exercise has been substantially burdened, we inquire whether the government's actions force a religious adherent to abandon a fundamental belief or tenet of the adherent's religion. Bryant v. Gomez, 46 F.3d 948, 949 (9th Cir.1995).
 
 
 49
 In this case, nothing in the record indicates that the prison's denial of a separate worship service for Nation of Islam Muslims forced Johnson to abandon a tenet of his faith. None of the evidence offered by Johnson demonstrated that congregate prayer was a mandate of the Nation of Islam. Therefore, I conclude that the prison's actions placed no substantial burden on Johnson's free exercise of his religion.
 
 
 50
 In my view, the majority strayed from the issue in this case by discussing "two categorical differences" between Nation of Islam and Orthodox Islam. Maj.Op. at [8-9]. It is not necessary, nor in my opinion appropriate, to determine the issue of substantial burden on the exercise of one religion by comparing it with another. Furthermore, I do not find the majority's discussion of prisoners' use of religion to gain other means is appropriate in a discussion of substantial burden. Maj.Op. at [8-9]. Discussion of this type should be limited to the second part of the RFRA analysis, that is, when there is a substantial burden, whether the government has adopted the least restrictive means of furthering a compelling governmental interest. See 42 U.S.C. Sec. 2000bb-1(b).
 
 
 51
 For the foregoing reasons, I concur in the majority opinion to the extent it holds that the MANCI prison officials' actions did not substantially burden Johnson's free exercise under the RFRA.
 
 
 
 [1]
 Although it appears there may be as many as 10 other MANCI inmates who profess to be Nation of Islam Muslims, this is not a class action and Johnson may not assert the rights of other inmates
 
 
 [2]
 Employment Div. v. Smith, 494 U.S. 872 (1990)
 
 
 [3]
 Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 113 S.Ct. 2217 (1993)
 
 
 [4]
 Johnson concedes he subscribes to the basic tenets of the Islamic religion with certain noted exceptions
 
 
 [5]
 Indeed we see little difference between this and what occurs in a Catholic church when the Sacrament of Marriage is being performed. Those of the Catholic faith kneel to pray at the appropriate time, while the rest stay seated or standing, as the case may be
 
 
 [6]
 We note in this regard that the number of persons within the prison professing belief in a specific religion or sect is also a factor properly considered in deciding an issue of this nature. As we stated earlier, this is not a class action and Johnson is the only plaintiff before us
 
 
 [7]
 In reaching our decision that no substantial burden is being placed on Johnson's exercise of his religious beliefs, we, as did the district judge, also take into account the various avenues open to Johnson in addition to attending services to supplement his prison religious experience as are detailed in the stipulation of facts. Bryant is also instructive in this regard because the court concluded that
 Bryant has not given this court any basis for concluding that he cannot accomplish the mandates of his religion through the means that the defendants do provide in his prison. These include 1) "inter-faith" Christian services that are designed to accommodate the needs of various Christian denominations, 2) Pentecostal literature in the prison library, and 3) a Pentecostal volunteer who is available to attend Bible study classes and focus more specifically on the beliefs of the Pentecostal faith.
 46 F.3d at 949-50. Similar alternatives are provided by the defendants in the case at bar.