UNITED STATES of America

v.

PHILADELPHIA YEARLY MEETING OF THE RELIGIOUS SOCIETY OF FRIENDS

No. CIV.A. 03–4254.

United States District Court, E.D. Pennsylvania.

June 21, 2004.

Gregory S. Hrebiniak, Jonathan D. Carroll, U.S. Dept of Justice, Washington, DC, for Plaintiff.

Peter Goldberger, Ardmore, PA, for Defendant.

## MEMORANDUM

DALZELL, District Judge.

In this action brought under 26 U.S.C. § 6332(d)[1], the Internal Revenue Service

---

1. Section 6332(d)(1) provides that any person who refuses to surrender any property or right to property subject to. levy "shall be liable in his own person and estate to the United States in a sum equal to the value of the property or rights not so surrendered,"

seeks to hold the Philadelphia Yearly Meeting of the Religious Society of Friends ("Yearly Meeting") directly liable for the unpaid taxes of one of its employees, Priscilla Lippincott Adams, as the sanction for its refusal to honor a levy on Ms. Adams's wages. The Yearly Meeting contends that it is not liable because the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb–1 et seq., barred the Service from compelling its assistance in the collection of Ms. Adams's back taxes. For its part, the Service argues that the Yearly Meeting's RFRA claim is indistinguishable from Ms. Adams's own invocation of the statute, which our Court of Appeals decisively rejected in *Adams v. C.I.R.*, 170 F.3d 173 (3d Cir.1999).

The parties have entered into an extensive stipulation of facts and filed cross-motions for summary judgment.[2] We conclude that under the rather unique circumstances of this case, RFRA did not exempt the Yearly Meeting from honoring the Service's levy on Ms. Adams's salary, and it must therefore suffer the consequences of its non-compliance. However, because this action raises issues of first impression under RFRA, a "bona fide dispute exists concerning … the legal effectiveness of the levy," 26 C.F.R. § 301.6332–1(b)(2), and the Yearly Meeting is not liable for a fifty percent penalty that the Service would otherwise be entitled to collect pursuant to § 6332(d)(2).

*Factual and Procedural History*

A. *The Yearly Meeting*

The Yearly Meeting is the coordinating body for over one hundred Quaker Month-

ly Meetings in the mid-Atlantic region and their 12,000 members. Since its founding in 1681, the Yearly Meeting has endorsed the "Peace Testimony" that is one of the core shared beliefs of Quakers. As Professor Emma Lapsansky–Werner of Haverford College explains in her declaration in support of the Yearly Meeting's motion, the Peace Testimony "comprises a dual obligation to oppose war and develop techniques to learn about and promote peace." Lapsansky–Werner Decl. ¶ 5.

The best known expression of the Peace Testimony is Quakers' historic refusal to serve in the military, but they have also objected to the payment of taxes that support war. During the Civil War, when the Government allowed conscientious objectors to pay a commutation fee or undertake duty "in the hospitals, or to the care of freedmen," Congress accommodated Quakers' opposition to war taxes by directing that their commutation fees "be applied to the benefit of the sick and wounded soldiers." Act of Feb. 24, 1864, ch. 13, § 17, 13 Stat. 6, 9.

The Government now funds the military with its general revenues rather than special war taxes. Some Quakers have concluded that because the Internal Revenue Code does not allow them to earmark their taxes for civilian purposes, conscience forbids them from paying federal income taxes altogether. Since the Vietnam War era, a small but steady minority of the Yearly Meeting's own employees have taken this position. Although the Yearly Meeting has no general religious objection to the

---

along with costs and interest. Section 6332(d)(2) imposes a fifty percent penalty upon any person whose failure to comply with a levy is "without reasonable cause."

2. The Service has declined to challenge the constitutionality of RFRA as applied to the

federal government. *See United States v. Indianapolis Baptist Temple*, 224 F.3d 627, 629 (7th Cir.2000) (noting that constitutionality of RFRA as applied to the federal government is "not without doubt").

federal income tax and acknowledges its duty as an employer to participate in the withholding system, Quaker beliefs require it to support the tax protesters' endeavors. As Yearly Meeting General Secretary Thomas Jeavons explains,

[t]he Yearly Meeting considers it a sacred duty to support the conscientious actions of its individual members, especially in such historic witnesses as the peace testimony. The Yearly Meeting believes that to withdraw such support, for any reason, would directly violate one of its most fundamental religious principles: the sanctity of obedience to the guidance of the Inner Light (or Divine Spirit) as revealed in the individual conscience and confirmed by the discernment of the faith community.

First Jeavons Decl. ¶ 17 (Deft.'s Ex. 11).

Over the years, the Yearly Meeting has devised a number of policies that attempt to reconcile its acknowledged duty to render unto Caesar with its religious obligation not to impede the promptings of its employees' consciences. From 1968 to 1975, the Yearly Meeting withheld, but did not forward to the Service, the "military portion" of two employees' taxes, and the Service eventually seized these sums from a Yearly Meeting bank account. In 1975, it adopted a policy of refusing to honor levies on tax protesters' wages, and in 1983 it reaffirmed this policy and specified that "taxes not paid should be re-directed to an alternative or escrow fund, or to a recognized charitable cause." Stip. Facts ¶ 18–20.

The Government brought an action in 1988 to enforce levies on the salaries of two employees, and the Yearly Meeting argued that compelling its cooperation in the enforcement of the levy would impermissibly burden its free exercise of religion. Shortly after the Supreme Court's watershed decision in *Employment Div. v.*

*Smith,* 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990), but before the enactment of RFRA, Judge Norma Shapiro of this Court concluded that the third-party levy provision of the Internal Revenue Code is a neutral, generally applicable law that passed constitutional muster under *Smith. United States v. Philadelphia Yearly Meeting of the Religious Soc'y of Friends,* 753 F.Supp. 1300, 1303–04 (E.D.Pa.1990).

While the case before Judge Shapiro was pending, the Yearly Meeting adopted a detailed policy of limited compliance with the Internal Revenue Code. Under the policy, the Yearly Meeting withholds from every employee's salary the amount required under 26 U.S.C. § 3402. However, if an employee has a conscientious objection to the payment of taxes that is based on historic Quaker principles, the Yearly Meeting declines to pay over the withheld amount to the Service, deposits it in a bank account where it is available for levy, and so notifies the Service. *See* Stip. Facts ¶ 21; *see also* Philadelphia Yearly Meeting of the Religious Society of Friends, *Policy on Military Tax Refusal by PYM Employees and IRS Levies and Other Collection Efforts,* 1988–1989 Yearbook, App. A, at 175–76 (1989) (Stip.Ex. 7).

This policy enables the Yearly Meeting to make monies available to the Service without directly subverting its employees' tax protest, and the Service gave it *de facto* recognition by levying the bank account on many occasions in the 1990s. *See, e.g.,* Stip. Facts ¶ 22 (detailing levies on behalf of Ms. Adams from 1991 to 1998). The Yearly Meeting never contested these levies. Although the Service discontinued the levies in 1998, the Yearly Meeting apparently continues to comply with the policy.

## B. *Priscilla Adams*

Priscilla Adams is a member in good standing of her Monthly Meeting whose Quaker ancestors settled in the Delaware Valley in the mid-seventeenth century. Ms. Adams has refused to pay federal income taxes since 1974. In keeping with Quaker practice, Ms. Adams has sought— and received—confirmation from her Monthly Meeting that her tax resistance is a "leading from God." First Adams Decl. ¶ 2, 5–9, 11 (Deft.'s Ex. 12).

Ms. Adams has worked for the Yearly Meeting in various capacities since 1984, and she is now a Regional Secretary for Quaker Concerns. *Id.* ¶ 1. There is no doubting the sincerity of Ms. Adams's protest[3], but it is nevertheless fair to say that she has engaged in a cat-and-mouse game with the Service that has greatly exacerbated the Yearly Meeting's current conflict with the Government. Between 1984 and 1989, Ms. Adams claimed on her W–4 form that she was entitled to an eyebrow-raising nine allowances, and as a result, the Yearly Meeting did not withhold any taxes at all from her pay. On April 20, 1989, the Service instructed the Yearly Meeting to disregard Ms. Adams's W–4 and instead withhold taxes from her wages "as if [she] is married and claiming 1 withholding allowances [*sic* ] ...." Letter of Somerset to Yearly Meeting of 4/20/89 (Stip.Ex. 9).

The Yearly Meeting has complied with the Service's instructions since 1989 by withholding taxes from Ms. Adams's wages at the rate appropriate for a married person filing jointly and claiming one allowance. Stip. Facts. ¶ 27. However, her

current tax liability exceeds the amount that would be available for levy from the Yearly Meeting's bank account even if the Service were inclined to acquiesce in the organization's withholding policy. There are no funds in the account for the period from 1986 to 1988. Moreover, for every year at issue in this action, Ms. Adams eventually filed as a married person filing separately and thereby lost the benefit of the lower tax rates she would have enjoyed had she filed a joint return.[4]

The Service assessed deficiencies and penalties against Ms. Adams for the years 1988, 1989, and 1992–1994. Ms. Adams filed a petition in the Tax Court asserting, *inter alia,* that RFRA mandated a finding that her religious beliefs constitute "reasonable cause" under 26 U.S.C. § 6651 for her refusal to pay tax and an "unusual circumstance" exempting her from penalties pursuant to 26 U.S.C. § 6654. *Adams v. C.I.R.,* 110 T.C. 137, 139–40, 1998 WL 88184 (1998). After the Tax Court ruled in the Service's favor on both the tax and penalty issues, Ms. Adams took an appeal to our Court of Appeals. For reasons we examine below, the Court rejected her position concerning RFRA and affirmed the Service's assessment. *See Adams,* 170 F.3d at 178–80, 182.

## C. *The Origins of this Action*

On February 21, 2001, the Service acted upon its victory in the Court of Appeals by sending Ms. Adams notice of its intent to levy her wages for unpaid taxes and penalties for the period from 1986 to 1996. She apparently refused to respond, and on April 11, 2001, the Service sent the Yearly

---

**3.** As our Court of Appeals noted in 1999, "Adams has taken pains to ensure that she does not profit from her tax protests ...." *Adams,* 170 F.3d at 174.

**4.** Between 1986 and 1995, excluding 1990 and 1991, Ms. Adams did not file a timely

income tax return, and the Service prepared substitute returns in accordance with 26 U.S.C. § 6020. In 1997, Ms. Adams filed amended returns for 1986–1989 and 1992–1995. She filed a timely return in 1996. Stip. Facts ¶ 30.

Meeting a Notice of Levy on Ms. Adams's wages in the amount of $42,397.69.[5]

The Yearly Meeting's governing body replied that Ms. Adams's tax protest was consonant with Quaker beliefs and that it believed her "to be Divinely led in taking the stance she has." The letter reported that "for us as a Quaker organization to act to collect those taxes which she has refused to pay as a result of these deeply held religious convictions ... would be unconscionable ... [and] a complete betrayal of our own principles as a people of faith." It requested that the Service "not require us to act as your collection agent in this matter ...." Letter from Yearly Meeting to Fuquay–Steele of 6/6/01 (Stip.Ex. 4).

On October 15, 2001, the Service responded that it considered the Yearly Meeting's position to be meritless in view of *Adams*. It further warned that if the Yearly Meeting persisted in defying the levy, the Government would institute a suit under 26 U.S.C. § 6332(d), pursuant to which the organization would incur direct liability for Ms. Adams's unpaid taxes along with a fifty percent penalty. Letter of Lyons to Yearly Meeting of 10/15/01 (Stip.Ex. 5). When the Yearly Meeting failed to comply, the Government commenced this action.

*Discussion*

RFRA is the Yearly Meeting's only defense in this action. We therefore begin by examining whether RFRA exempts the Yearly Meeting from honoring the levy, and because we conclude that it does not, we turn to consider whether the Yearly Meeting is liable for the fifty percent penalty under § 6332(d)(2).

*A. Enforcement of the Levy*

Congress enacted RFRA in response to *Smith* and "to restore the tests that were routinely employed before the Supreme Court's ruling that neutral, generally applicable laws may impinge on religious practices, even in the absence of a compelling state interest." *Adams*, 170 F.3d at 176. As our Court of Appeals explained in *Adams*, a RFRA claimant must first demonstrate a "substantial burden" on the exercise of religious belief. The Government must then demonstrate that its regulation or practice furthers a "compelling interest" by the "least restrictive means." *Id.*, quoting 42 U.S.C. § 2000bb–1(a) & (b).

*1. Substantial Burden*

■ RFRA does not explain what constitutes a "substantial burden" on the exercise of religion. However, a useful definition derived from the Supreme Court's pre-*Smith* decisions is that it arises when the Government "put[s] substantial pressure on an adherent to modify [her] behavior and to violate [her] beliefs" or "forces an individual to choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion." *Branch Ministries v. Rossotti*, 40 F.Supp.2d 15, 25 (D.D.C.1999), *quoting Sherbert v. Verner*, 374 U.S. 398, 404, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), and *Thomas v. Review Bd. of Indiana Employment Sec. Div.*, 450 U.S. 707, 718, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981).

■ The record demonstrates that the levy on Ms. Adams's wages substantially burdened the Yearly Meeting's exercise of religion within the meaning of RFRA. First, Secretary Jeavons's declaration ex-

---

**5.** The Government calculates that, as of December 22, 2003, the deficiency had grown to $49,188.37.

plains that the Yearly Meeting's refusal to comply with the levy grows out of Quakers' shared beliefs. The Yearly Meeting recognizes Ms. Adams's tax protest as divinely-led expression of the Peace Testimony, and Quakers deem it a "sacred duty" to support the conscientious actions of an individual member, regardless of whether the majority endorses that member's conduct. First Jeavons Decl. ¶ 17.

Second, the levy placed substantial pressure on the Yearly Meeting to betray its religiously based support for Ms. Adams. As we have already noted, § 6332(d) saddles a third party who refuses to honor a levy with both direct liability for the unpaid taxes and, where appropriate, a fifty percent penalty. The Service heavy-handedly wielded these enforcement sabres in its effort to pressure the Yearly Meeting to serve up Ms. Adams, at one point even offering to waive the penalty in exchange for immediate compliance. *See* Letter of Hubbert to Yearly Meeting of 6/2/03 (Stip.Ex. 6).

### 2. *The Government's Burden*

Because the Yearly Meeting has established that the Service's conduct substantially pressured it to abandon core Quaker beliefs, the burden shifts to the Government to show that enforcement of the levy furthers a compelling interest by the least restrictive means.

The Government argues that it need not go through this exercise because *Adams* demands the conclusion that the levy does not violate RFRA. However, this assertion is based on an overly expansive reading of *Adams*. The issue in *Adams* was whether uniform and mandatory participation in the federal income tax system is the least restrictive means of advancing the Government's compelling interest in collecting taxes. Ms. Adams contended that the Government had failed to show that it

could not achieve its purpose by some means that accommodates conscientious objectors' beliefs, perhaps by setting aside their tax monies for non-military purposes. Our Court of Appeals rejected her argument, concluding instead that

> [t]he least restrictive means of furthering a compelling interest in the collection of taxes ... is in fact, to implement that system in a uniform, mandatory way, with Congress determining in the first instance if exemptions are to built [*sic*] into the legislative scheme. The question of whether government could implement a less restrictive means of income tax collection surfaced in pre-*Smith* case law and was answered in the negative based on the practical need of the government for uniform administration of taxation, given particularly difficult problems with administration should exceptions on religious grounds be carved out by the courts.

*Adams*, 170 F.3d at 179.

While this language is broad, the Court expressly noted that its decision was not "tantamount to exempting the IRS from RFRA altogether." *Id.* at 180. Given that RFRA apparently still has some play in the tax area, we think that this action is distinguishable from *Adams*. There is an important difference between the routine assessment and collection of taxes, which was the governmental practice at issue in *Adams*, and the Service's efforts to secure the payment of delinquent taxes, which became necessary in Ms. Adams's case after she defied our Court of Appeals's 1999 decision.

As the Court made clear in *Adams*, the routine administration of the federal income tax system requires uniform assessments and mandatory participation. By contrast, the levying process focuses on non-complying taxpayers' individual circumstances, and it often involves the exer-

cise of discretion as to what assets and sources of income the Government pursues or foregoes. There may well be a case in which the Service can choose between two means of satisfying a taxpayer's delinquency, one of which substantially burdens the free exercise of religion (perhaps that of a third party, as here) and one of which does not. Although we need not reach the issue here, we think it plausible that such a case would implicate RFRA.

The governmental interest in uniform and compulsory participation in the tax system that informed the Court's analysis in *Adams* thus has little relevance once the Service must resort to a levy to collect back taxes from a person such as Ms. Adams. Because we conclude that *Adams* does not govern this case in the manner the Government has suggested, we turn to examine the nature of the Government's interest in levying and whether its use here is the least restrictive means of advancing that interest.

Perhaps because the Supreme Court has not extensively addressed the constitutionality of the levy and distraint provisions of the Internal Revenue Code since the Hoover Administration, *see Phillips v. C.I.R.,* 283 U.S. 589, 592–601, 51 S.Ct. 608, 75 L.Ed. 1289 (1931), the precise nature of the Government's "compelling interest" in these powers is an issue of first impression. However, the Court has indirectly answered this question in its modern cases construing § 6332 and related statutes. As the Court has emphasized, the reason the levy requires broad construction—and has been a cornerstone of federal revenue laws since 1791—is that the Government needs a speedy, cheap, and certain means of collecting delinquent taxes. *See id.* at 595 n. 5, 51 S.Ct. 608 (gathering late eighteenth- and early nineteenth-century statutes). As the Court noted in a 1985 deci-

sion that distilled over a half century's cases on the levy,

> [t]he underlying principle justifying the administrative levy is the need of the government promptly to secure its revenues. Indeed, one may readily acknowledge that the existence of the levy power is an essential part of our self-assessment tax system, for it enhances voluntary compliance in the collection of taxes. Among the advantages of administrative levy is that it is quick and relatively inexpensive.

*United States v. Nat'l Bank of Commerce,* 472 U.S. 713, 721, 105 S.Ct. 2919, 86 L.Ed.2d 565, (1985) (internal quotations and citations omitted).

■ The remaining question under RFRA is whether the levy on Ms. Adams's wages was the least restrictive means of achieving the Government's interest in quickly and inexpensively discharging her deficiency. The Yearly Meeting argues that the Government has failed to satisfy its burden because there were at least two other means of achieving its goals, neither of which would have required a wage levy.

First, the Yearly Meeting argues that the Government could have acquiesced in its policy of withholding protesters' taxes and placing them in a bank account that the Service can then levy. Moreover, it contends that if the bank account does not contain enough funds to satisfy Ms. Adams's liability, the blame lies with the Service itself for having instructed the Yearly Meeting to withhold at the rate for a married person filing jointly.

There are two major difficulties with this argument, and as a result we cannot reach—at least in this round of the Yearly Meeting's dispute with the Government— the very interesting question of whether

RFRA compels the Service to respect the Yearly Meeting's withholding policy.[6]

In the first place, it does not account for the fact that part of Ms. Adams's tax liability derives from the period before 1989, when she was claiming nine exemptions on her W–4 and the Yearly Meeting had not yet implemented its current withholding policy.

Moreover, the Yearly Meeting's claim that Ms. Adams's tax liability is the Service's own fault presupposes that it had an obligation to monitor her filing status and adjust its 1989 withholding instructions accordingly. The Yearly Meeting offers no support for this proposition, and indeed there is no justification for it. Like any other taxpayer, Ms. Adams was responsible for ensuring that her withholding accorded with her tax obligations. Nothing in the Service's 1989 instructions precluded Ms. Adams from directing her employer to withhold more from her wages to reflect the fact that she wished to file as a married person filing separately. Indeed, the Service assumed that Ms. Adams would complete a new W–4 that would supersede its interim instructions. *See* Letter of Somerset to Yearly Meeting of 4/20/89 (Stip.Ex. 9) (directing Yearly Meeting to "disregard this employee's Form W–4 ... until you receive a new Form W–4 from your employee"). This argument also fails because, lest we forget, it was not until 1997 that Ms. Adams filed her tax returns for 1986–1989 and 1992–1995. As the Government notes, the Service cannot

be expected to have clairvoyantly anticipated in 1989 that Ms. Adams would decide eight years later to file as a married person filing separately.[7]

The Yearly Meeting also faintly argues that the Service could have located and then levied Ms. Adams's personal bank accounts or other property. It is true, as the Yearly Meeting notes, that the Service has the power to trace and set aside fraudulent transfers and that "[j]ointly owned assets of husband and wife may be vulnerable to collection." Pl.'s Mem. at 21 n. 9. However, the parties have stipulated that Ms. Adams's salary from the Yearly Meeting is her only income, *see* Stip. Facts ¶ 29, and there is nothing in the record to suggest that Ms. Adams has other property that could satisfy her tax liability.

The Yearly Meeting's argument, therefore, boils down to the proposition that RFRA required the Service to investigate Ms. Adams's bank accounts and other property once it knew that the wage levy would burden her employer's exercise of religion. However, the imposition of the duty to engage in a time-consuming, and possibly fruitless, scavenger hunt for other assets would be inconsistent with the Government's compelling interest in the speedy exercise of its levying power.

In sum, we agree with the Yearly Meeting that the levy substantially burdens its exercise of religion. We also acknowledge that RFRA might have required a different result if (1) Ms. Adams had ensured

---

**6.** We would have had the opportunity to examine this question if the Yearly Meeting had honored the levy but placed the funds in its bank account along with the monies it has withheld to satisfy Adams's current tax obligations. Instead, the Yearly Meeting flatly refused to serve in any manner as the Service's "collection agent." Letter from Yearly Meeting to Fuquay–Steele of 6/6/01 (Stip.Ex. 4).

**7.** The Yearly Meeting also argues that the Service's 1989 withholding instructions somehow violated 26 U.S.C. § 6013, which governs joint tax returns, because Ms. Adams has never elected to use this filing status. However, the Service never compelled Ms. Adams to file a joint return. Instead, it merely extended her the courtesy of directing her employer to withhold at the lower rate for joint filers.

that the Yearly Meeting's account contained sufficient funds to satisfy her tax liability[8], (2) she or the Yearly Meeting had promptly identified other property that the Service could have levied as readily as her wages, or (3) the Yearly Meeting had honored the levy but placed the monies in its bank account and so notified the Service. However, neither the Yearly Meeting nor Ms. Adams pursued these possibilities. We must therefore conclude on the record actually before us that the levy on Ms. Adams's wages was the least restrictive means of achieving the Government's compelling interest in satisfying her tax deficiency. Because the Yearly Meeting refused to cooperate with the Service and RFRA offers no defense for its conduct, it is directly liable for her back taxes under § 6332(d)(1).

### B. *The Fifty Percent Penalty*

◼ Having concluded that the Yearly Meeting cannot rely on RFRA to avoid direct liability for Ms. Adams's tax deficiency, we must determine whether it is subject to a penalty for refusing to honor the levy on her wages. Pursuant to § 6332(d)(2), a third party who fails with-

out reasonable cause to comply with a levy on the property of a taxpayer is liable for a penalty equal to fifty percent of the amount directly recoverable from the third party in satisfaction of the taxpayer's underlying liability. The regulations implementing § 6332(d)(2) further provide that

> [t]he penalty ... is not applicable in cases where [a] bona fide dispute exists concerning ... the legal effectiveness of the levy. However, if a court in a later enforcement suit sustains the levy, then reasonable cause would usually not exist to refuse to honor a later levy made under similar circumstances.

26 C.F.R. § 301.6332–1(b)(2).

The Government offers two arguments in favor of the penalty's applicability. First, it contends that there was no bona fide dispute here because this action is governed by *Adams*.[9] We have already concluded that the holding of *Adams* does not control the dispute here. As we explain above, this case raises an issue the Court of Appeals did not have occasion to consider in *Adams:* whether, and under what circumstances, RFRA governs the collection of taxes after a taxpayer has

---

8. If Ms. Adams had made up the shortfall in the Yearly Meeting's bank account, the Service would then have had the option of levying either her wages, thereby burdening the Yearly Meeting's exercise of religion, or the bank account, which might have been onerous to her but would not have required her employer's complicity.

9. The Government also argues that this case is controlled by *Packard v. U.S.*, 7 F.Supp.2d 143 (D.Conn.1998). In *Packard*, a Quaker refused to pay taxes voluntarily but acquiesced in levies on her bank account. She then sued under RFRA for the return of the penalties included in the levies, arguing that the assessment of penalties was not the least restrictive means of ensuring her payment of taxes because the Government could readily levy her account. The district court rejected this argument because "levying taxpayers' as-

sets is at odds with the Government's compelling interest in the collection of taxes under the present system." *Id.* at 147.

Although *Packard* would be a useful precedent for the Government in a case involving the Yearly Meeting's policy of placing employees' tax monies in a bank account and then acquiescing in levies, it is not particularly informative here. As we have already noted, the issue in this case is not whether RFRA requires the Government to choose between the current system of taxation and some alternative means of assessment and revenue allocation (*Adams*) or routine collection (*Packard*). Instead, the issue is whether RFRA constrains the Government's discretion in collecting back taxes once a tax protester has already disrupted what *Packard* terms "the collection of taxes under the present system." 7 F.Supp.2d at 147.

defied the Service and compelled it to choose among its various enforcement tools to satisfy a deficiency. Thus, this case both factually and doctrinally begins where *Adams* left off, and for the reasons provided above, we do not think that the answers to the issues it raises are so self-evident or fully settled that a penalty is warranted here. *Accord Philadelphia Yearly Meeting,* 753 F.Supp. at 1306, *citing United States v. Sterling Nat'l Bank & Trust Co.,* 494 F.2d 919, 923 (2d Cir.1974) (penalty inappropriate under § 6332 when enforcement of levy depends on "an unsettled question of law").

Finally, the Government seizes upon the final provision of § 6332–1(b)(2) and argues that the Yearly Meeting is liable for the penalty because its defeat in the case before Judge Shapiro almost fifteen years ago put the organization on notice that its position here is untenable. The fatal flaw in this argument, of course, is that Judge Shapiro decided the case under *Smith.* If we were to penalize the Yearly Meeting because it lost the 1990 case, we would effectively be holding it hostage to the jurisprudence Congress sought to reverse when it enacted RFRA.

*Conclusion*

For better or for worse, the peculiar facts of this case have precluded a more comprehensive analysis of RFRA's effect on the Yearly Meeting's ongoing efforts to accommodate its employees' religious beliefs. What we *have* decided is that, although honoring the levy on Ms. Adams's wages would substantially burden the Yearly Meeting's exercise of religious belief, the Service has a compelling interest in the expeditious and inexpensive satisfaction of her tax liability. The Service had no duty to investigate Ms. Adams's assets, and because neither she nor the Yearly Meeting identified other property that the Service could have attached, the least re-

strictive means of achieving its interest was the levy at issue here. Finally, we have concluded that the fifty percent penalty is not warranted because the Yearly Meeting has raised novel and important questions about the reach of RFRA in the aftermath of *Adams.*